UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| M-R LOGISTICS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| v. | ) | 07-40139-FDS |
| | ) | |
| RIVERSIDE RAIL, LLC, EDWARD DUNN, and JOANNE WILEY, | ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

**MEMORANDUM AND ORDER ON DEFENDANTS'
MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

**SAYLOR, J.**

This is a dispute concerning a contract to provide rail cars to transport construction and demolition debris. Jurisdiction is based on diversity of citizenship. Plaintiff M-R Logistics, LLC, contends that defendant Riverside Rail, LLC, breached the contract and further alleges that defendants Edward Dunn and Joanne Wiley personally guaranteed Riverside's obligations under the contract.

M-R is based in Massachusetts and Riverside is based in New Jersey. The contract at issue is governed, according to its terms, by Massachusetts law, and contemplated daily communications between New Jersey and Massachusetts over the life of the contract. Riverside nonetheless contends that it is not subject to personal jurisdiction in a Massachusetts court. Dunn and Wiley are New Jersey residents who have likewise moved to dismiss for lack of personal jurisdiction. For the reasons stated below, the motion to dismiss will be denied as to Riverside and granted as to Dunn and Wiley.

## I.  Statement of Facts

### A.  The Parties

Plaintiff M-R Logistics, LLC, is a limited liability company based in Shrewsbury, Massachusetts.  M-R provides transportation, logistics, and disposal services for a variety of materials, including construction and demolition debris.  Clyde Ames is the only member of M-R.

Defendant Riverside Rail, LLC, is a limited liability company based in Franklin Lakes, New Jersey.  Riverside operates a rail transfer station in New Jersey for construction and demolition debris.  Riverside does not maintain any office or operation in Massachusetts.

Defendants Edward Dunn and Joanne Wiley are citizens of New Jersey.  At the time of contract execution and negotiation, Dunn was the only member (and thus the managing member) of Riverside.  Wiley's position is unclear, although she acknowledges that she was an "authorized agent" of Riverside.  Wiley submitted an affidavit stating that Dunn had promised her membership in the LLC, but never delivered on that promise.  She nonetheless signed the contract at issue in this case as a "member" of Riverside.[1]

### B.  The Contract

According to Ames, in approximately 2003 he had a "series of communications" with Wiley about the railroad waste industry.  Wiley eventually introduced Ames to Dunn.  The record is unclear about how these communications were initiated, who initiated them, and where they took place.

Contract negotiations began in approximately early 2005.  In March 2005, M-R sent a

---

[1] Dunn submitted an affidavit stating that, notwithstanding Wiley's signature on the contract as a "member," she "was not a member of [the LLC] at that, or any other time."  He also stated that although she "was in negotiations with [the LLC] to become a member," those negotiations did not come to fruition.

Pricing Quotation/Service Agreement signed by Ames and (apparently) a draft Service Agreement. Riverside contends, and M-R does not dispute, that the only physical meetings to take place prior to execution of the contract took place in New Jersey. Although it appears that telephone conversations and communications between the parties occurred during the negotiations period, the details are not set forth in the record.

Eventually, the parties executed both the Pricing Quotation/Service Agreement (which Wiley and Dunn signed on July 30, 2005) and the Service Agreement (which all parties signed, but did not date).

Under the contract, the M-R would provide empty rail cars, such as gondolas and other open-top cars, at the Riverside transfer station in New Jersey. Riverside would fill the rail cars with construction and demolition debris and transport that material to Ohio for disposal. M-R was obliged to repair and maintain the rail cars provided. The rail cars, at least while subject to the contract, never physically entered Massachusetts.

The contract was for a term of five years. The "Operations" paragraph of the contract (Paragraph 7) contemplated a "daily" exchange of information between the two parties:

> Customer will provide M-R daily (Monday through Saturday) with the following locations relative to the Paterson, NJ loading site: a status of the railcars located at spot, the railcars released loaded for outbound shipment, and the associated net weights of the loaded railcars released for shipment using a form provided by M-R (see attached).

That information formed part of the basis for invoicing Riverside, as provided in Paragraph 8. Paragraph 5 of the contract stated that M-R (in addition to providing the railcars) is responsible for fleet tracking, tracing, and expediting; rail carrier local service; rail-based line-haul transportation; issuing bill of lading instructions; disposal service; destination logistic services

(railcar unloading and motor carrier hauling); and providing monthly, quarterly and annual summaries of railcar shipments.

The "Governing Law" provision of the Service Agreement states that "the Agreement and its performance shall be governed by, subject to and construed in accordance with the laws of the State of Massachusetts."

### C.      The Alleged Personal Guarantees

The complaint alleges that Dunn and Wiley "personally guaranteed the contract's financial obligations." Complaint, ¶ 26. The contract itself, however, states only the following:

> **13.      Guarantee.** For the significant commitment for capital services provided by M-R to Customer during the course of the term specified, M-R *will require* a guarantee by the founding companies and/or equity participants - that they will unconditionally and irrevocably guarantee prompt and punctual payment on all obligations and liabilities due M-R under the terms of the Agreement and Service Quotation together with all attorney's fees, costs and expenses of collection incurred by M-R or its successors and assignees in enforcing any such obligations and liabilities.

(emphasis added). No independent evidence of such a guarantee is in the record. Both Dunn and Wiley have submitted affidavits denying that they ever entered into such a guarantee. Ames submitted an affidavit that states the following:

> In the contract, [Wiley] agreed to personally guarantee a future event, and the use of the word "will," only refers to the fact that, should the future event occur, at that time the signatory would be responsible for the obligation incurred, and does not refer to any future action of signing a guarantee.

(Ames Aff., ¶ 8, Aug. 21, 2007).

### D.      The Operation of the Contract and the Alleged Breach

According to an affidavit submitted by Ames, over the life of the contract the parties were in telephone or e-mail communication at least twice a day between Massachusetts and New

4

Jersey. This was necessary because of the daily logistics and coordination necessary for contract management.

At some point, according to M-R, Riverside failed to pay its obligations under the contract. On April 13, 2007, M-R sent correspondence to Riverside seeking assurances that it would continue to honor the terms and conditions of the contract. M-R received no such assurances, and filed the present action. At the time the action was commenced, Riverside owed M-R $103,432.17.

M-R filed the present complaint on May 8, 2007, against Riverside, Dunn, and Wiley. M-R seeks to recover the past due amount of $103,432.17 plus liquidated expectancy damages and interest in the amount of $1,920,000. All three defendants have moved to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2).

**II.**     **Analysis of Personal Jurisdiction over Riverside**

    **A.**     **General Principles of Personal Jurisdiction**

The exercise of personal jurisdiction over a defendant is only appropriate if it is both authorized by statute and consistent with the due process requirements of the United States Constitution. *Good Hope Indus., Inc. v. Ryder Scott, Co.*, 378 Mass. 1, 5-6 (1979); *Nowak v. Tak How Inv., Ltd.*, 94 F.3d 708, 712 (1st Cir. 1996); *Intech, Inc. v. Triple "C" Marine Salvage, Inc.*, 444 Mass. 122, 125 (2005). Furthermore,

> A district court may exercise authority over a defendant by virtue of either general or specific jurisdiction. Specific jurisdiction exists when there is a demonstrable nexus between a plaintiff's claims and a defendant's forum-based activities. General jurisdiction exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state.

*United States v. Swiss American Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir. 2001) (citations and quotations omitted).

The plaintiff bears the burden of showing that the court has personal jurisdiction over the defendant. *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 50 (1st Cir. 2002). A district court faced with a motion to dismiss under Rule 12(b)(2) may choose among several methods for determining whether the plaintiff has met its burden: the "prima facie" standard, the "preponderance-of-the-evidence" standard, or the "likelihood" standard. *Id.* at 50-51 & n.5. The "most conventional" and "most commonly used" of these methods is the "prima facie" standard. *Id.* at 51; *Foster-Miller, Inc. v. Babcock & Wilcox Can.*, 46 F.3d 138, 145 (1st Cir. 1995); *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 675 (1st Cir. 1992).

In conducting that analysis, the court is required to take specific facts affirmatively alleged by the plaintiff as true (whether or not disputed) and "construe them in the light most congenial to the plaintiff's jurisdictional claim." *Massachusetts School of Law at Andover, Inc. v. American Bar Association*, 142 F.3d 26, 34 (1st Cir. 1998). The court then "add[s] to the mix facts put forward by defendants, to the extent they are uncontradicted." *Daynard*, 290 F.3d at 51. The prima facie method is appropriate here because the jurisdictional inquiry does not involve materially conflicting versions of the relevant facts. *See Foster-Miller*, 46 F.3d at 145-146 (describing the preponderance-of-the-evidence standard and likelihood standards).

### B.  Personal Jurisdiction over Riverside

This case presents an issue of specific jurisdiction. The Massachusetts long-arm statute, Mass. Gen. Laws ch. 223A, § 3, states in relevant part:

A court may exercise personal jurisdiction over a person, who acts directly or by

an agent, as to a cause of action in law or equity arising from the person's:

a) transacting any business in this commonwealth . . . .

Mass. Gen. Laws ch. 223A, § 3.[2] In order for jurisdiction to exist under that subsection, (1) the defendant must have transacted business in Massachusetts, and (2) the plaintiff's claim must have arisen from the defendant's transaction of such business. *Tatro v. Manor Care, Inc.,* 416 Mass. 763, 767 (1994).

The first question is whether plaintiff's claim arises from the "transaction of any business" by defendant in Massachusetts. The "transacting any business" language of Mass. Gen. Laws 223A, § 3(a) is interpreted very broadly. A defendant need not be physically present in a state to "transact business" in that state. *Energy Capital and Services LP II v. Hill Refrigeration, Inc.*, 989 F. Supp. 353, 355 (D. Mass. 1997). In some circumstances, relatively scant or isolated communication into Massachusetts may be enough to establish compliance with the long-arm statute. *See, e.g., Hahn v. Vermont Law School*, 698 F.2d 48, 50-51 (1st Cir. 1983) (holding that even though Massachusetts plaintiff initiated communications, plaintiff receiving law school application information and an admissions letter established personal jurisdiction over the law school); *Nova Biomedical Corp. v. Moller*, 629 F.2d 190, 194-195 (1st Cir. 1980) (sending a letter alleging patent infringement and threatening litigation created personal jurisdiction).

It is not true, however, that *any* contractual communication into Massachusetts is sufficient to establish personal jurisdiction. In the typical case, the focus is on the contacts relating to the formation of the contract; those contacts ordinarily must be instrumental to its

---

[2] Plaintiff acknowledges that the claim does not arise from defendants' "contracting to supply services or things in this commonwealth" under ch. 223A, §3 (b).

formation to establish jurisdiction. Thus, in the case of a typical bilateral contract and a "passive" purchaser, letters and phone calls into a forum that may accompany the an order "are viewed as ancillary activity without substantial commercial consequence in the forum." *Little, Brown and Co. (Inc.) v. Bourne*, 493 F. Supp. 544, 547 (D. Mass. 1980); *cf. Good Hope Industries, Inc. v. Ryder Scott Co.*, 378 Mass. 1, 10-11 (1979).[3]

Where, however, there are extensive post-contract communications that relate to the operation of the contract itself, the out-of-state party may be deemed to have transacted business in the commonwealth. Thus, in *Little*, a Massachusetts publishing company sought to recover a monetary advance made to an author in the District of Columbia under a publishing contract. 493 F. Supp. at 545. The publishing process required frequent communication between the author and the Massachusetts editors—drafts were received in Boston and circulated among the editors, the manuscript was marked up for galleys, and letters and outlines were regularly exchanged. *Id.* at 546-547. The court held:

---

[3] *See Lyle Richards Intern., Ltd., v. Ashworth, Inc.*, 132 F.3d 111, 112-114 (1st Cir. 1998) (post-contract telephone calls two or three times a week regarding ongoing contract performance does not confer personal jurisdiction); *Harlow v. Children's Hospital*, 432 F.3d 50, 62 (1st Cir. 2006) ("Because causation is central to the relatedness inquiry . . . *in most cases*, contacts coming into existence after the cause of action arose will not be relevant") (internal citation omitted) (emphasis added); *Massachusetts School of Law*, 142 F.3d at 35 (". . . if a contract claim, our stereotypical inquiry *tends* to ask whether the defendant's forum-based activities are 'instrumental in the formation of the contract'") (emphasis added); *Champion Exposition Services v. Hi-Tech Elec.*, 273 F. Supp. 2d 172, 176-177 (D. Mass. 2003) (distinguishing *Lyle Richards* and finding personal jurisdiction on ground that pre-execution contacts were instrumental in the formation of the contract); *Workgroup Technology Corp. v. MGM Grand Hotel, LLC*, 246 F. Supp. 2d 102, 111-112 (D. Mass. 2003) (distinguishing *Lyle Richards* because Massachusetts contacts crucial to the formation of the contract in dispute); *Aub v. Technicolor Entertainment Services*, 224 F. Supp. 2d 371, 374 (D. Mass. 2002) (repeated mail and telephone communication to Massachusetts are "isolated and fortuitous" and do not establish personal jurisdiction when consulting contract executed in California and plaintiff subsequently moved to Massachusetts). *Contra Halchak Corp., Inc. v. Symbiot Business Group, Inc.*, 2007 WL 2800790 p. *2 (D. Mass. 2007) ("The mailing of one check to [plaintiff] under the [contract] does, however, constitute a business transaction in Massachusetts and is enough to confer personal jurisdiction on this court").

> [W]here by the nature of the performance called for under the contract the defendant becomes actively involved in plaintiff's business in Massachusetts, for example by monitoring the plaintiff's performance and supervising compliance with specifications and procedures, defendant's contacts are more than that of a passive purchaser and its involvement with the forum is enough to support jurisdiction . . . . Scores of interdependent acts go into the process [of writing a book] . . . . Whether or not defendant was free to do his writing outside of Massachusetts, he knew that as a consequence of entering into the contract with the plaintiff and mailing each of six chapters to Boston, he set in motion a complicated series of editing and printing steps, in every case unique to the particular author and book.

*Id.* at 547-548.[4]

*Good Hope* presented a similar situation. There, an out-of-state defendant provided appraisals and studies of natural gas reserves for a Massachusetts plaintiff under a consulting contract. 378 Mass. at 3-6. Plaintiff frequently provided data to the defendant, which was necessary for the defendant to form its reports, and each natural gas study was the subject of numerous follow-up phone calls. *Id.* at 4. Plaintiffs relied on the information in these reports in formulating financing and development plans. *Id.* at 5. Based on these findings, the court concluded: "We think that by sending appraisal reports and by initiating numerous telephone calls to the plaintiffs at their headquarters in Massachusetts, the defendant undertook purposeful activity in the forum." *Id.* at 11.[5]

---

[4] *Little* expressed doubt that personal jurisdiction would be present if "a manuscript was already written and edited and its author sought only a publisher who would set it into type and market it without changing its contents." 493 F. Supp. at 548 n.2.

[5] *See also Phillips Exeter Acad. v. Howard Phillips Fund, Inc.*, 196 F.3d 284, 289 (1st Cir. 1999) ("In contract cases, a court charged with determining the existence *vel non* of personal jurisdiction must look to the elements of the cause of action and ask whether the defendant's contacts with the forum were instrumental either in the formation of the contract or in its breach"); *C & W Fabricators, Inc. v. Metal Trades, Inc.*, 2002 WL 32759591 (D. Mass. 2002) p. *4-5 (holding that post-contract-formation telephone calls and fax transmissions were sufficient to establish jurisdiction when at least some of the communications contained information that became the subject of the lawsuit).

Here, the post-contract communications easily satisfy the requirements of the long-arm statute. Pursuant to the specific obligations set forth in the contract, Riverside had daily contacts (indeed, multiple daily contacts) with M-R in the course of the operation of the contract. Riverside had to communicate detailed, constantly changing railcar data to Massachusetts six days per week. M-R would not have been able to perform its contractual duties, or invoice Riverside, without that data.

Those repeated contacts with Massachusetts plainly constitute "transacting business" in the commonwealth within the meaning of ch. 223A, § 3(a). Furthermore, as in *Little* and *Good Hope*, this cause of action can be fairly said to arise from that transaction of business and the contacts at issue were neither "isolated" or "fortuitous." The statutory personal jurisdiction requirements of ch. 223A, § 3(a) have thus been met.

### C. Due Process

That determination does not, however, end the inquiry, as the exercise of personal jurisdiction must also comport with the due process requirements of the Fourteenth Amendment. *See International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Whether the exercise of personal jurisdiction satisfies due process requires a three-part analysis. First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's forum state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state court foreseeable. Third, the exercise of jurisdiction must be, in light of certain "gestalt factors," reasonable. *Pritzker v. Yari*, 42 F.3d 53, 60-61 (1st Cir. 1994). Here, the exercise of personal

jurisdiction over Riverside plainly does not offend constitutional principles.

### 1. Relatedness

The first consideration is whether M-R's claims arise out of, or relate to, Riverside's Massachusetts activities. This is a "flexible, relaxed standard" that is functionally the same as the statutory requirement noted above. *Pritzker*, 42 F.3d at 61.[6] Here, the injury resulted not from a dispute about the literal terms of the contract itself, but from defendant's alleged non-payment of past due fees and purported unwillingness to abide by the contract for the remaining forty months. The post-formation contacts are thus obviously relevant and related to the question of *why* the contract was allegedly eventually breached.

### 2. Purposeful Availment

The second consideration is whether defendant's contacts with Massachusetts represent a purposeful availment by Riverside of conducting business in the state. "The function of the purposeful availment requirement is to assure that personal jurisdiction is not premised solely upon a defendant's random, isolated or fortuitous contacts with the forum state." *Sawtelle v. Farrell*, 70 F.3d 1381, 1391 (1st Cir. 1995). The two focal points are voluntariness and foreseeability. *Ticketmaster-New York, Inc., v. Alioto*, 26 F.3d 201, 207-208 (1st Cir. 1994). The defendant's contacts with the forum state must be voluntary—that is, not based on the unilateral actions of another party or a third person. *Burger King Corp. v. Rudzewicz*, 471 U.S.

---

[6] Some cases have observed that a court may sidestep the statutory inquiry and proceed directly to the constitutional analysis because the Supreme Judicial Court of Massachusetts has interpreted the state's long-arm statute as an assertion of jurisdiction over the person to the limits allowed by the Constitution of the United States. *See, e.g., Daynard*, 290 F.3d at 52; *Sawtelle*, 70 F.3d at 1388. When courts adopt this mode of analysis, they generally treat the Massachusetts long-arm statute and the "relatedness" prong of the three-part analysis as functionally identical. *See Sawtelle*, 70 F.3d at 1388.

462, 475 (1985). Furthermore, a defendant's contacts with the forum state must be such that he should reasonably anticipate being haled into court there. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Finally, the court may look at all of the communications and transactions between the parties, before, during, and after the consummation of the contract, to determine the degree and type of contacts the defendant had with the forum, apart from the contract alone. *See Ganis Corp. of Cal. v. Jackson*, 822 F.2d 194, 198 (1st Cir. 1987) (*relying on Burger King*, 471 U.S. at 475).

Here, defendant's contacts with Massachusetts were plainly voluntary. Riverside telephonically or electronically contacted a Massachusetts company multiple times daily for more than two years, and regularly sent faxes and other communications to Massachusetts. There was absolutely no element of surprise or involuntariness.[7]

Similarly, it was entirely foreseeable that Riverside could be haled into court in Massachusetts. The contract contained a choice of law provision that specified the contract was "governed by, subject to, and construed in accordance with" the laws of Massachusetts; clearly the most likely forum in which Massachusetts law would be enforced is a Massachusetts court. Furthermore, as noted, Riverside communicated information multiple times daily to the Massachusetts office of a company based in Massachusetts.

This court may not, of course, consider any one of these factors in isolation as dispositive.

---

[7] Defendant correctly asserts that merely entering into a contract with a company based in Massachusetts "is not in and of itself dispositive of the personal jurisdiction question," *Platten v. HG Berm. Exempted Ltd.*, 437 F.3d 118, 136 (1st Cir. 2006) and that "[T]he mere unilateral activity of those who claim some relationship with a non-resident Defendant cannot satisfy the requirement of contact with the forum state." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). This means that personal jurisdiction might have been lacking if, for instance, Riverside contracted with M-R (a company it knew to be located in Massachusetts) and M-R then unilaterally moved its entire operation to Idaho. But defendant contracted with a plaintiff it knew to be based in Massachusetts, and that remained in Massachusetts during the entire duration of the contract.

12

*Platten*, 437 F.3d at 136 (merely dealing with a corporation known to be incorporated in Massachusetts does not by itself give Massachusetts personal jurisdiction); *Burger King*, 471 U.S. at 481-82 (stating that a governing law provision is a factor courts should consider, although by itself insufficient to confer jurisdiction). Nonetheless, it is clear that the "purposeful availment" requirement is satisfied. Defendant signed a contract with a company located in Massachusetts, agreed that Massachusetts law would govern the contract, and sent significant information to Massachusetts under the contract every day for more than two years. Considering these factors in totality, Riverside purposefully availed itself of the benefits, rights and protections of the commonwealth.

### 3. "Gestalt" Factors

Finally, the constitutional analysis requires this court to determine whether the exercise of jurisdiction, in light of the "gestalt" factors, would be reasonable. These factors are:

> (1) the defendants' burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interest of all sovereigns in promoting substantive social policies.

*Nowak*, 94 F.3d at 717.

First, it would probably be somewhat burdensome for Riverside to defend itself in Massachusetts, as Riverside's only place of business is in New Jersey. However, it is "almost always inconvenient and costly for a party to litigate in a foreign jurisdiction." *Id.* at 718. For this particular factor to have any significance, the defendant must demonstrate that the exercise of jurisdiction in the present circumstances is onerous in a special, unusual, or other constitutionally significant way. *Pritzker*, 42 F.3d at 64. Riverside cannot make that demonstration here.

Second, Massachusetts has an interest in adjudicating alleged violations of contracts affecting Massachusetts businesses and governed by Massachusetts law. Third, plaintiff's choice of forum must be accorded a degree of deference. *Sawtelle*, 70 F.3d at 1395. This is obviously the most convenient forum for plaintiff, as it is M-R's principal place of business. Fourth, Riverside does not contend that New Jersey (or any other state) has a greater interest than Massachusetts in the resolution of this case. Fifth, the interests of the affected governments in promoting substantive social policies are not affected.

Thus, on balance, the "gestalt" factors are either neutral or favor the plaintiff. Accordingly, the exercise of jurisdiction in Massachusetts will not offend traditional notions of fair play and substantial justice. Because both the statutory and constitutional requirements have been satisfied, Riverside's motion to dismiss for lack of personal jurisdiction will therefore be denied.

### C. Personal Jurisdiction over Dunn and Wiley

None of the parties in this case seemed to differentiate, in their various filings, between jurisdiction over Riverside and jurisdiction over the individual defendants. This Court must nonetheless determine if there is an independent basis for jurisdiction over those defendants pursuant to the Massachusetts long-arm statute and the Constitution.

If personal jurisdiction exists over the two individual defendants, it presumably must be based on one of three theories: (1) that jurisdiction may be based on their activities as corporate officers, acting on behalf of the corporation, (2) that jurisdiction may be based on their activities by disregarding the corporate form, or (3) that jurisdiction may be based on their activities

operating independently of the corporation (e.g., by personally guaranteeing its obligations).[8] None of those theories will support the exercise of personal jurisdiction over the individual defendants here.

First, it is axiomatic that "jurisdiction over the individual officers of a corporation may not be based on jurisdiction over the corporation." *Johnson Creative Arts, Inc. v. Wool Masters, Inc.*, 573 F. Supp. 1106, 1111 (D. Mass. 1983); *LaVallee v. Parrot-Ice Drink Products of America, Inc.*, 193 F. Supp. 2d 296, 300 (D. Mass. 2002). While Massachusetts courts have consistently rejected a blanket rule that employees who act in their official capacity are absolutely shielded from suit in their individual capacity (the so-called "fiduciary shield doctrine"), more than mere participation in the corporation's affairs is required. *Id.* at 301-302; *see also Interface Group-Massachusetts, LLC v. Rosen*, 256 F. Supp. 2d 103, 105 (D. Mass. 2003); *Laforest v. Ameriquest Mortg. Co.*, 383 F. Supp. 2d 278, 285 (D. Mass. 2005); *Johnson Creative Arts*, 573 F. Supp. at 1111.[9] For jurisdictional purposes, employees are "not to be judged according their employer's activities [but by whether they were] primary participants in the alleged wrongdoing intentionally directed at the forum." *LaVallee*, 193 F. Supp. 2d at 301 (quoting *Calder v. Jones*, 465 U.S. 783, 790 (1984)). This necessarily entails an inquiry, under general principles of agency law, of whether an officer or employee derived personal benefit from their contacts in

---

[8] The relevant case law has developed almost exclusively in the context of corporations and corporate officers, but there appears to be no reason why the same principles should not apply with equal force to a limited liability company and its members. For the sake of simplicity, this portion of the memorandum will use the terms "corporate" and "corporation."

[9] The Supreme Court has not expressly accepted or rejected the doctrine, but has stated in dicta that jurisdictional questions involving corporate employees are fact-specific and rejected a blanket rule that "employees who act in their official capacity are somehow shielded from suit in their individual capacity." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984).

Massachusetts and/or acted beyond the scope of their employment. *LaVallee*, 193 F. Supp. 2d at 302. Here, however, there is no allegation, much less evidence, that either Dunn nor Wiley gained any personal benefit from the alleged breach of contract or acted outside the scope of his or her employment.

Second, for jurisdictional purposes, courts have disregarded the corporate form when an individual defendant ". . . was the alter ego of the corporation or . . . had an identity of interest with the corporation itself (i.e., the corporation and the corporation's president)." *Id.* at 301 (*citing Davis v. Metro Productions, Inc.*, 885 F.2d 515, 520-521 (9th Cir. 1989); *In re Vitamins Antitrust Litigation*, 120 F. Supp. 2d 58, 70-71 (D.D.C. 2000)). There is no such evidence in this case.

Third, jurisdiction over individuals may be based on their personal activities and obligations, above and beyond their roles as corporate officers. Here, it is at least arguable that Dunn and Wiley are subject to the jurisdiction of the courts of Massachusetts because they personally guaranteed an obligation to a Massachusetts LLC under a contract to be governed by Massachusetts law.

The problem with that theory, however, is that there is no evidence that such a guarantee was ever created. The contract itself does not contain such a guarantee; it simply states that the plaintiff "will require" a guarantee. No such guarantee was made part of the record in this case. Both Dunn and Wiley submitted affidavits denying that they executed any guarantee. It is also noteworthy that Dunn and Wiley signed the contract as "Managing Member" and "Member," respectively, and did not sign it in their individual capacities. Nor is there any contrary or disputed evidence tending to prove the opposite; indeed, the affidavit by Ames simply contends

that the contractual language should be interpreted to create a guarantee.

When confronted with a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of persuading the court that jurisdiction exists. *Callahan v. Harvest Board Int'l, Inc.*, 138 F. Supp. 2d 147, 157 (D. Mass. 2001).  The Court would consider giving plaintiff an opportunity to conduct jurisdictional discovery if such discovery were likely to shed light on a disputed issue.  Here, however, plaintiff simply argues that the contract contained personal guarantees, which it plainly does not.  Given the affirmative evidence before the Court that no personal guarantee was ever executed, the bare allegations of the complaint are not enough.

### III. Conclusion

For the foregoing reasons, the motion of defendants Riverside Rail LLC and Edward Dunn to dismiss for lack of personal jurisdiction is GRANTED as to defendant Dunn and DENIED as to defendant Riverside Rail LLC.  The motion of defendant Joanne Wiley to dismiss for lack of personal jurisdiction is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: February 8, 2008